# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.    '24  MJ3629
AT&T Wireless, 11760 US Highway 1, STE. 600 )
North Palm Beach, FL 33408 )
re: (714) 856-8606 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2113(b), 844(h), 844 (i), 26 U.S.C. 586(d) | Attempted Bank Burglary, Use of an Explosive to Commit a Felony, Use of a Explosive Device to Damage Property, Possession of a Destructive Device |

The application is based on these facts:

See Attached Affidavit of search warrant, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alex Esconde, Special Agent FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date:  September 25, 2024

_____
*Judge's signature*

City and state:  San Diego, California

Hon. Michael S. Berg, U.S. Magistrate Judge
_____
*Printed name and title*

### Attachment A
**Property to Be Searched**

**AT&T Wireless** hosts the electronic communication account associated with the telephone number (714) 856-8606 that is the subject of this search warrant and search warrant application (the "**Subject Account**").

**AT&T Wireless** is an electronic communication service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at **11760 U.S. Highway 1, North Palm Beach, FL 33408**.

**Attachment B**

I.    Service of Warrant

The officer executing the warrant shall permit the Provider in Attachment A, as custodian of the electronic files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II.   Items to be Seized

Agents shall seize the following records, data, and information covering June 1, 2024, through and including August 23, 2024, and maintained by the Provider for the **Subject Account** identified in Attachment A:

a.  Subscriber information, including:
   i.   Names;
   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
   iii. Local and long distance telephone connection records;
   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.   Length of service (including start date) and types of service utilized;
   vi.  Telephone or instrument numbers, including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
   vii. Other subscriber numbers or identities; and
   viii. Means and source of payment (including any credit card or bank account number) and billing records.

b.  Records and other information about past wire or electronic communications sent or received by the **Subject Account**, including:
   i.  the date and time of the communication;
   ii. the method of the communication;

iii.  the source and destination of the communication, such as the source and destination telephone numbers (call detail records), email addresses, or IP addresses;

iv.  Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data communications;

v.  All available Timing Advance Reports, including True Call Data and Quantum Data, to include cell site, sector, and distance from tower, IP session and Data;

vi.  All available Mobile Data Session and IPv6 reports.

vii.  Device identifiers, such as IMEI, for all devices (watches, HUM, tablets, etc.) that are connected/paired to this number/subscriber account.

which are evidence of violations of Title 18, United States Code, Section 2113(b) (Attempt Bank Burglary), Title 18, United States Code, Section 844 (h) (Use of an Explosive to Commit a Felony), Title 18, United States Code, Section 844(i) (Use of an Explosive Device to Damage Property), and Title 26, United States Code, section 5861(d) (Possession of a Destructive Device).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**AFFIDAVIT**

I, Alex Esconde, Special Agent, Federal Bureau of Investigation (FBI), being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     This affidavit supports applications by the United States of America for a search warrant for **AT&T Wireless**, a wireless telephone service provider headquartered at **11760 US Highway 1, Suite 600, North Palm Beach, Florida 33408**, as described in Attachment A, to search the account associated with the following cellular phone number (714) 856-8606 (the "**Subject Account**"), serviced by AT&T, and believed to be used by Son NGUYEN for subscriber information, telephone toll data, and cell-site geo-location information from June 1, 2024, through and including August 23, 2024. There is probable cause that these records and information constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2113(b) (Attempt Bank Burglary), Title 18, United States Code, Section 844 (h) (Use of an Explosive to Commit a Felony), Title 18, United States Code, Section 844(i) (Use of an Explosive Device to Damage Property), and Title 26, United States Code, section 5861(d) (Possession of a Destructive Device) collectively the "**Target Offenses**" as further described in Attachment B. This affidavit and application are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a), which applies to providers of electronic communication services. **AT&T Wireless** provides electronic communication services in the form of cellular and wireless telephone service for the **Subject Account**.

**EXPERIENCE AND TRAINING**

2.     I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United

States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since February 2003.  As a Federal Agent, I am authorized to investigate violations of laws of the United States and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States. I am currently assigned to the Violent Crimes Task Force of the FBI's San Diego Field Office where I investigate various crimes that include, but are not limited to, bank robberies, commercial robbery chains, kidnappings, extortions, fugitives, assaults on federal officers, and murders of United States citizens in foreign countries.  During the course of my duties, I have prepared search and arrest warrants and have participated in the execution of search and arrest warrants.

4.    I completed eighteen weeks of training at the FBI Academy in Quantico, Virginia. During the training, I received instruction in a variety of investigative techniques commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of confidential human sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies and skills, forensic techniques, and a variety of other subjects.

5.    I have completed the certification for the FBI's Cellular Analysis Survey Team (CAST).  The training included instruction regarding obtaining and analyzing cellular communication data, historical call detail record analysis, geospatial mapping, and tower dump analysis and comparisons to establish links between significant locations/persons and cellular tower data.

6.    In connection with bank robbery, bank burglary, and commercial robbery investigations in which I have participated, as well as upon information

2

relayed to me by other individuals, including conversations with other law enforcement officers, I am familiar with the methods used by individuals who commit such thefts. Burglaries, like bank robberies, are typically planned in advance. Individuals committing these types of theft crimes commonly communicate and coordinate with each other prior to, during and after each event using cellular/wireless telephones. Furthermore, in most bank robberies and burglaries, surveillance of the targeted location is conducted prior to the attempt.

7.     I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, and information gained through my training, experience, and communications with colleagues and observations that have been reported to me either directly or indirectly.

8.     The basis for my opinions and conclusions set forth below, which I draw from the facts stated herein, are derived from my training and experience and my conversations with other Special Agents of the FBI, Task Force Officers (TFOs), and detectives, officers, and other local investigators familiar with violent crime, robberies, and burglaries. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that others or I have learned during the course of this investigation Dates and times outlined below are approximate.

## PROBABLE CAUSE

### *Background of the Case*

9.     The FBI is conducting a criminal investigation on a target identified as Son NGUYEN (NGUYEN), who used fire and/or explosive device to break into two automated teller machines (ATM(s)) in San Diego County on June 8, 2024

and June 28, 2024, all within the Southern District of California, in violation of the **Target Offenses** identified above. The victim banks and credit unions were federally insured by either the National Credit Union Administration (NCUA) or the Federal Deposit Insurance Corporation (FDIC) at the time of each attempted burglary.

### *California Coast Credit Union ATM Bombing - June 8, 2024*

10.     On June 8, 2024, at approximately 3:24 AM, NGUYEN, damaged and an ATM machine by means of an explosion, which was located on the premises of California Coast Credit Union ("CCCU"), located at 3284 Governor Drive, San Diego, CA 92122 (hereinafter, the "CCCU ATM bombing").  At the time of the bombing, all CCCU's deposits were insured by the National Credit Union Administration ("NCUA").

11.     Through video surveillance recordings, Investigators saw that at 3:24 AM, NGUYEN arrived at the CCCU in a black colored sedan (later determined to be a Volvo) with aluminum rims, wearing a dark colored t-shirt, and brown/green colored beanie and balaclava (a form of cloth headgear designed to expose only part of the face, usually the eyes and mouth).  Upon arrival, NGUYEN exited the driver's side of the vehicle on foot carrying unknown tools/devices.  NGUYEN then appeared to make multiple attempts, using the tools, to pry the cash dispense door open.

12.     At approximately 3:26 AM, NGUYEN brought a blue plastic container (approximately 5 gallons in size) with white spout, from the area of NGUYEN's vehicle, to the area in front of the CCCU ATM.  NGUYEN then appeared to insert a black polyvinyl chloride plastic ("PVC") hose (as seen in the picture below), with wires attached, into the CCCU ATM machine.

//

//



13.   A short time afterwards, a small explosion occurred inside of the CCCU ATM. At approximately 3:77 AM, NGUYEN returned to the CCCU ATM, and appeared to manipulate the CCCU ATM. NGUYEN did not gain access to the CCCU ATM and left the scene of the attempted burglary and/or bombing in the vehicle. At approximately 3:36 AM, the San Diego Police Department ("SDPD") received a call from Alarm Unlimited, which is the alarm company for CCCU. The company reported that the CCCU ATM had been tampered with.

14.   At approximately 3:40 AM, SDPD officers arrived on scene at the CCCU ATM. They observed a white PVC pipe connected to a black PVC pipe with two batteries taped to it. They also observed pieces of what looked like a blue balloon around the ATM. Approximately 20 feet from the CCCU ATM was another plastic pipe.

*First Citizen's Bank ATM Bombing – June 28, 2024*

15.   On June 28, 2024 at approximately 2:10 AM, NGUYEN again damaged an ATM machine by means of an explosion. This time, the ATM was located on the premises of First Citizen's Bank ("FCB"), located at 16536 Bernardo Center Drive, San Diego, CA 92128 (hereinafter, the "FCB ATM bombing").

5

16.     According to the surveillance video, NGUYEN arrived in a black Volvo S40 sedan and parked in the drive through ATM lane. NGUYEN wore a long sleeve shirt, and beanie and balaclava visibly similar to the ones worn during the CCCU bombing. NGUYEN then removed tools from the rear passenger area of his vehicle and appeared to use the tools to manipulate the FCB ATM cash dispenser area. At one point NGUYEN again reached into the back seat of the vehicle through the open rear driver's side door and removed another tool/device that appeared to have a valve attached to the top.

17.     At approximately 2:11 AM, NGUYEN pulled the vehicle forward and continued to use tools to pry open the FCB ATM door. At approximately 2:12 AM, NGUYEN got into the driver's seat of the vehicle, drove away from the FCB ATM, and exited the FCB parking lot. At approximately 2:13 AM, NGUYEN returned to the FCB parking lot and pulled back into the FCB ATM drive through.  NGUYEN removed a metal u-shaped rod from the rear passenger seat of the vehicle and then manipulated the device into the FCB ATM's cash dispensary slot. NGUYEN then removed the tool/device and appeared to put it into the rear seat of the vehicle. NGUYEN then removed a separate tool/device from the vehicle, knelt in front of the FCB ATM, and pushed the device into the FCB ATM. The tool/device appeared to have wires attached (as shown in the photographs below).



18.     At approximately 2:15 AM, NGUYEN got back into the vehicle and pulled the vehicle away from the FCB ATM with the tool/device still wedged into the FCB ATM, and the wires attached to the tool and extending into the driver's seat area of the vehicle.

19.     Between 2:15:30 AM and 2:15:46 AM, the attached camera on the FCB ATM suddenly jolted.  Upon review, NGUYEN appeared to pull on the wires that were attached to the tool/device wedged into the FCB ATM.  NGUYEN then exited the driver's door of the vehicle and manipulated the tool/device still wedged into the FCB ATM.

20.     At approximately 2:15:53 AM, NGUYEN's vehicle pulled away from the FCB ATM with the tool/device still wedged into the FCB ATM, and the wires still attached.   From approximately 2:16 AM through 2:51 AM, smoke began emitting from the FCB ATM.

21.     At approximately 3:23 AM, SDPD received a call to investigate a burglary alarm at the FCB ATM. Upon arrival, officers observed the FCB ATM with smoke coming out of it and electrical components on fire. Electrical wires protruded from the machine with a metal rod bent into a U-shape attached. Additionally, blue material with a white and black valve was found in front of the ATM (as shown in the photographs below).



*Identification of NGUYEN'S Vehicle*

22.     Through FCB's surveillance footage, the license plate was clearly visible on the vehicle NGUYEN used, which showed a California plate 24876J1. Also clear from that footage was that the vehicle was a Volvo sedan. Although the type of vehicle, and license plate was not clearly identifiable through the CCCU ATM bombing surveillance footage, it was clear that the vehicle used in that bombing was also a sedan, similar to a Volvo, and that the vehicles used in both burglaries seemed identical.

23.     A query of the California Department of Motor Vehicles ("DMV") database revealed that California license plate 24876J1 was registered as a 2013 Ford van, and that the registered owner was Mouanne's Distributors West, 6101 Rickenbacker Road, Commerce, CA 90040. Based on this discrepancy, investigators believed at that time, and still believe, that the license plate affixed to NGUYEN's vehicle during the FCB ATM bombing was used temporarily to avoid law enforcement detection.

24.     A closer examination of NGUYEN's vehicle from FCB surveillance video, revealed minor damage or some sort of anomaly apparent on the trunk area of the vehicle just below the license plate as shown here:



25.    Using the known information described above, a query of the California License Plate Reader ("LPR") database was conducted. Through that search, investigators found a Volvo S40 sedan, bearing California license plate 6VZT858 (hereinafter, the "LPR Volvo") that had visible characteristics similar to the vehicle used in the burglaries, which included a similar anomaly to the trunk under the license plate, similar rims, and similar vehicle tint.



26.    The LPR database revealed that the LPR Volvo had a heavy presence in the areas of the CCCU and FCB ATM burglaries.



1

### *Identification of NGUYEN and His Residence*

2      27.      Based on a review of the surveillance videos from both the CCCU

3  and FCB ATM burglaries, the perpetrator had visible facial features that were very

4  similar, such as the bridge-area near the nose, and the eyes.  Additionally, the

5  subject appeared to be wearing the same knit cap and facial covering.  The subject's

6  stature and mannerisms were also very similar.  As explained further below, further

7  investigation identified the vehicle NGUYEN likely used in both burglaries,

8  which, through the actual registration, revealed NGUYEN's California Driver's

9  license identification photograph.  A comparison of NGUYEN's facial features

10  from his driver's license photograph to still photographs taken from the CCCU and

11  FCB burglaries revealed several similarities including the eye shapes, nose bridge,

12  and the bagginess or puffiness under the eyes as shown below.




**\*\*Cal Coast ATM\*\*\***      **\*\*First Citizens Bank\*\***

**\*\*NGUYEN DMV Photo\*\***

28.    The LPR Volvo license plate information revealed that it was registered to NGUYEN, residing at 7413 Canyon Breeze Drive, San Diego, CA. A query of other law enforcement databases confirmed that NGUYEN resided at that same address.

29.    On July 25, 2024, a physical surveillance was conducted at 7413 Canyon Breeze Drive, San Diego, CA. During the surveillance, the LPR Volvo was observed parked in front of the residence.  The LPR Volvo appeared to be the same make and model of the vehicle used in both burglaries, and it had similar (if not identical) rims, tinted windows, and damage to the trunk as described and depicted above.

### *Search Warrants and Arrest of NGUYEN*

30.    On August 23, 2024, NGUYEN was arrested at his residence, and federal search warrants authorizing searches of NGUYEN's residence, as well as the LPR Volvo, were executed. Investigators found the following in NGUYEN's residence: a u-shaped rod, a metal plate welded onto a pole, a balaclava, and a beanie. Investigators also found gas, black powder, potassium nitrate sulfur, explosive pre-cursor chemicals, a paper that explains how to make black powder and a firearm in NGUYEN'S residence. Investigators found the following in NGUYEN'S car: a black hose, neck gaiter and California license plate bearing number 24876J, which was the same license plate affixed to NGUYEN'S car at the time of the attempted burglaries of the ATMs . All of this equipment and clothing is consistent with what was used during the ATM bombings and burglaries.

31.    Investigators also found the following digital items during the search of NGUYEN's residence and vehicle:

      a. Apple iPhone in a red aluminum case located in NGUYEN's bedroom.

b. Samsung GT-S5670L cellular phone, serial number R21C21ACD3H, IMEI 356971-04-322435-3 found in NGUYEN's vehicle

c. Nine (9) SD flash memory cards found in NGUYEN's bedroom and one SD Flash memory card found in a 3D printer in NGUYEN's residence.

32.     On August 23, 2024, at approximately 9:49 AM, Bea Nguyen, NGUYEN's mother advised NGUYEN's cell phone number was the **Subject Account**.  While being questioned by investigators, Bea looked up NGUYEN's number, pressed the send button on her phone, and called NGUYEN's number.

33.     While seizing the Apple iPhone investigators observed a missed call notification with a timestamp of 9:49 AM, on the lock screen of the iPhone.  The missed call at this time likely indicates the red iPhone was the phone associated with the **Subject Account**, which Bea Nguyen called during her interview with investigators.

34.     Based on my experience and training, consultation with other law enforcement officers experienced in robbery and burglary investigations, and all the facts and opinions set forth in this affidavit, I know that individuals involved in robberies and burglaries often utilize cell phones in the weeks and months prior to, during, and after a robbery or burglary, so those phones could contain:

a. Photographs depicting clothing, disguises worn (e.g., masks or bandanas), weapons and materials used during the robberies and burglaries, along with any proceeds seized from the armed robbery;

b. Communications with co-conspirators coordinating and then executing the robberies or burglaries, to include coordinating and executing flight from areas where the crimes were committed;

c. Celebratory remarks after the successful completion of the robberies or burglaries;

d. Photographs depicting clothing and gear used during robberies or burglaries; and

e. Communications about covering up or hiding their crimes and escaping or hiding their crimes and escaping or hiding from law enforcement.

35.     Based on my training and experience, historical cell detail records are relevant and material to the investigation of individuals who commit robberies or burglaries because such information can help identify the subjects and the physical location of the subjects' cellular telephone at the time of the crime. A subject will often communicate on a cellular telephone prior to, during, and after the commission of the crimes – including checking with accomplices about possible police presence. In addition, even though the subjects may not be actively on the cellular telephone during the commission of the crime, the cellular telephone may receive a text or an incoming call that the subject was not anticipating, thereby indicating the telephone's location. Additionally, crimes like these generally involve individuals who approach the bank as well as individuals who are responsible for driving a "get away" car and others who act as "lookouts" or "points" to warn of the arrival of law enforcement officers. The normal modes of communication for these types of subjects are cellular telephones. If NGUYEN had accomplices in the incidents described above, which is currently still unknown and continues to be investigated, it is likely that cellular telephones were used to coordinate their movements.

36.     Further, based on my training, locational data through historical cell detail records could also reveal efforts to plan and coordinate a burglary or robbery before and after the crime occurs. For example, co-conspirators will frequently scout a target bank ahead of the planned robbery or burglary. In this case, co-conspirators or NGUYEN acting alone likely sought out a vehicle to steal before

the plan went into operation. Additionally, locational data is important to identify stash houses, safe houses, and location of proceeds after the crimes occurred. Consequently, for the reasons provided above, I respectfully believe there will likely be relevant and responsive data on the **Subject Account** for the time period of June 1, 2024 through and including August 23, 2024.

37.     Based on my experience, knowledge of the investigation, and consultation with law enforcement agents who have training and experience in violent crimes, I know that AT&T accounts may generate and store geolocation data that would constitute relevant evidence in this investigation. That data would include not only a presence during or around the time of the incidents, but also location data that may corroborate or refute information provided by witnesses. The location data may also demonstrate an association amongst co-conspirators and others.

38.     Based on my training and experience, I know that in the days, weeks, or months after a robbery or burglary attempt, it is common for co-conspirators to communicate about their exposure and risks of apprehension, the destruction of evidence, and law enforcement efforts. Additionally, individuals involved in planned conspiracies will often conduct surveillance or reconnaissance of a bank prior to committing said offenses.  After the commission of crimes like these, it is common for subjects to destroy evidence, meet with co-conspirators, or travel to speak with and/or intimidate potential witnesses. Consequently, investigators believe that location data collected by AT&T for the above noted **Subject Account** may constitute evidence of the **Target Offenses**.  This evidence may significantly further the investigation.

## OVERVIEW OF RELEVANT TECHNOLOGY

39.     In my training and experience, I have learned that cellular providers such as AT&T and other wireless providers" are companies that provides cellular

14

telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

40.    Based on my training and experience, I know that wireless providers like AT&T can collect cell-site data about the **Subject Account**. I also know that wireless providers like AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

41.    Based on my training and experience, I know that wireless providers like AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers like AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone

and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the users of the phones used and may assist in the identification of co-conspirators.

42.     Based on my training and experience, and my consultation with other law enforcement officers, I am aware that wireless providers like AT&T routinely collect and store data for the electronic communication accounts to which it and other providers issue telephone numbers. The data includes: (i) subscribers' contact and billing information; (ii) detailed information concerning subscribers' incoming and outgoing telephone calls; (iii) detailed information concerning subscribers' outgoing direct calls, text message, and SMS messages; and (iv) detailed information concerning cell-site geo-location data.

43.     In particular, I know that cell phones connect to a provider's network through cell towers or cell sites. The particular tower or site may change as a phone moves from one location to another. Wireless providers like AT&T automatically record and retain this connection data as part of the **Subject Account**. Records and data identifying the towers or sites to which a phone connected therefore tend to identify the phone's and phone user's location at particular times.

*Request for "Per Call Measurement Data"*

44.     I also know that different providers use the speed with which signals travel between cell phones and cell towers ("per call measurement data," or "PCMD"), as well as other data, to better calculate and record the location of phones accessing their networks. Different providers may use different terminology to describe PCMD. Given the information provided above, I respectfully request PCMD for the time periods listed below (all times in PST): June 1, 2024 through August 23, 2024.

45.     Given these facts, I seek a warrant to search the **Subject Account** for the records and information in Attachment B.

### PRIOR ATTEMPTS TO OBTAIN THIS DATA

46.     The United States is unaware at this time of other attempts by the United States government to obtain this data by other means.


_____
Alex Esconde
FBI Special Agent


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 25th**th day of September 2024.**


_____
HONORABLE MICHAEL S. BERG
United States Magistrate Judge